Opinion
YEGAN, J.
This case involves a razor-blade-shank attack by “Southside” gang members on a Los Angeles County jail inmate who refused to stab another inmate at the gang’s behest. Humberto Miranda, Felix Vega, and Isaac Rangel appeal from the judgment entered after a jury trial. All were convicted of assault with a deadly weapon (count 1; Pen. Code, § 245, subd. (a)(1));[1] assault by means of force likely to produce great bodily injury (count 2; § 245, former subd. (a)(1), now subd. (a)(4)); and battery with serious bodily injury (count 3; § 243, subd. (d)). Codefendant Chris DeLeon was acquitted. As to each appellant, the jury found true great bodily injury allegations (§ 12022.7, subd. (a)) and gang enhancements (§ 186.22, *832 subd. (b)(1)(A) & (Q). As to Miranda, the jury found true an allegation that, in the commission of battery with serious bodily injury, he had personally used a “knife and razor.” (§ 12022, subd. (b)(1).) Vega and Rangel admitted prior felony convictions.
Miranda was sentenced to prison for 17 years, to be served first before serving life sentences in another case. (See § 669.) Vega was sentenced to prison for 11 years four months, to be served consecutively to a prior sentence in another case of 37 years four months. The aggregate term for both cases was 48 years eight months. Rangel was sentenced to prison for seven years four months, to be served consecutively to a prior sentence in another case of 25 years. The aggregate term for both cases was 32 years four months.
Appellants argue that the evidence is insufficient to support the gang enhancements. In addition, they argue that the trial court erroneously (1) denied their Wheeler-Batson motions, (2) instructed the jury during jury selection, and (3) excluded evidence of the guilty pleas of three codefendants. Vega claims that the trial court erroneously limited his closing argument to the jury. Finally, Vega and Rangel contend that the trial court erroneously sentenced them and failed to calculate the custody credits to which they are entitled. Only the final contention has merit. Miranda makes no claim of sentencing error, but his sentence is also erroneous. We vacate appellants’ convictions on count 2 and reverse their sentences on counts 1 and 3. We remand the matter with directions to resentence them and calculate Vega’s and Rangel’s custody credits. In all other respects, we affirm.

Facts

Appellants and DeLeon were members of different Southern California local criminal street gangs. Estuardo Tobias, the victim, claimed that he was not a gang member. In June 2008 Tobias, appellants, and DeLeon were inmates in “Dorm 816” at the North County Correctional Facility (NCCF) of the Los Angeles County jail. The dorm housed approximately 65 inmates, all of whom were Hispanic.
In the presence of Miranda, Rangel, and DeLeon, Vega ordered Tobias to cut another inmate with a knife. Tobias refused. Vega replied, “ ‘All right. If you don’t do it, you got that coming.’ ” Later that same day, Vega told Tobias that someone wanted to speak to him upstairs. Tobias understood that he was going to see “Puppet,” “the gang member who was running the jail.” According to Tobias, “Puppet was the one who would give orders about who should get beat up and what should happen among the gang members . . . .”
*833 After Tobias walked upstairs, Vega started fighting with him and “tried to take [him] down on the ground.” Miranda, Rangel, DeLeon, and “not less than another five [persons]” ran toward Tobias. The other persons included gang members Edgar Centeno, Skary Paredes, and Ivan Toscano.
Appellants cut Tobias with razor blades attached to toothbrushes. Tobias was punched and kicked. “There were blows, but there were so many of them [that Tobias] couldn’t tell . . . who did what.” Someone said, “ ‘Cut him, but make sure that you’re getting him on the neck.’ ” “The last thing [Tobias] remember[ed] was that someone said, ‘Hide. They’re coming.’ ”
Sheriff’s deputies arrived and stopped the fight. A deputy testified that he “saw five people attacking one person.” The deputy subsequently testified: “There could have been more.” “[I]t looked like there was approximately five or more.” Another deputy testified that he “saw approximately five inmates” surrounding Tobias and “punching him repeatedly in a violent manner.” “It could have been more, but I’m pretty certain that it was at minimum five.” Neither deputy saw the beginning of the fight.
Tobias was “drenched in blood.” Blood was “squirting from his wrist onto the walls.” He had “six or seven different injuries.”
Appellants had blood on their clothing and bodies. The DNA profile of blood found on Vega and Rangel matched the DNA profile of Tobias’s blood.
[[]]*

Sufficiency of the Evidence to Support the Gang Enhancements

Appellants contend that the evidence is insufficient to support the criminal street gang enhancements. The People were required to prove that the crimes for which appellants were convicted had been “committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .” (§ 186.22, subd. (b)(1).)

Standard of Review

“In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the *834 judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact’s findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] ‘A reviewing court neither reweighs evidence nor reevaluates a witness’s credibility.’ [Citation.]” (People v. Albillar (2010) 51 Cal.4th 47, 59-60 [119 Cal.Rptr.3d 415, 244 P.3d 1062].) ‘“A reversal for insufficient evidence ‘is unwarranted unless it appears ‘“that upon no hypothesis whatever is there sufficient substantial evidence to support” ’ the jury’s verdict. [Citation.]” (People v. Zamudio (2008) 43 Cal.4th 327, 357 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

Gang Evidence

Deputy Francis Hardiman testified for the People as a gang expert. He had qualified ‘“about 60 times” in Los Angeles County Superior Court as an expert on the Mexican Mafia or the Southside criminal street gang. The following summary of the gang evidence is primarily based on his testimony.
Appellants and DeLeon were members of both Southside and different Southern California Hispanic local criminal street gangs. Other inmates who participated in the assault upon Tobias—Edgar Centeno, Skary Paredes, and Ivan Toscano—were also gang members. Centeno was a member of the Pasadena Latin Kings gang and Southside, Paredes was a member of Southside, and Toscano was a member of the North Side Longos’ gang and Southside.[3]
Dorm 816, where the inmates were housed, was ‘“a Southside dorm.” An inmate was assigned there only if he had identified himself as a Southsider or jail officials had ‘“designated [him as a] possible Southsider.”
Southside was created by the Mexican Mafia in the early 1990s. The Mexican Mafia is a Hispanic prison gang. It and a rival Hispanic prison gang, Nuestra Familia, agreed to divide California into two territories. Hispanic gang members south of Delano are considered to be ‘“Southsiders.” Hispanic gang members north of Delano are considered to be ‘“Norteños.” Southsiders *835 owe their allegiance to the Mexican Mafia, while Norteños owe their allegiance to Nuestra Familia.
If you are a Southern California Hispanic gang member, ‘“[w]hen you come in from the street into [Los Angeles County jail], your gang rivalries out on the street end, and you are a member of the Southside” criminal street gang. When Tobias arrived at Dorm 816, Vega told him that, ‘“since they were working for the South, there was no fighting among them.”
A Southern California Hispanic gang member who did not want to be a Southsider always had the option of informing jail authorities that he ‘“can’t do this anymore.” The gang member would then “become a protective custody inmate.” Southsiders have an obligation to attack protective custody inmates if the opportunity arises.
A Mexican Mafia member in the Los Angeles County jail “is in control of all of the Southsiders within the . . . jail.” He is at the top of “a pyramid-like structure of leadership within the jail that controls the actions of the individual Southsiders.” The Los Angeles County jail is divided into seven facilities, and a “Southsider shot caller ... is in charge” of each facility. “The next step down from the facility shot caller [is] the floor shot caller.” Each floor is divided into modules or dorms, and each module or dorm has a Southside shot caller. If a Southsider wants to use violence against an inmate, he generally must get permission “from the various shot callers above [him].”
Every week, each dorm shot caller collects “taxes” from the Southsiders in his dorm. The taxes are forwarded to the Mexican Mafia. “So each dorm each week . . . generate [s] income” for the Mexican Mafia.
A set of rules called “the Southside rules” applies to all Southsiders in jail. “The rules are designed to strictly control violence by the Southside [rs].” “[E]ach individual member of the Southside is expected to keep an eye on the other members and help enforce those rules.” Hardiman gave several examples of the Southside rules.
Any Hispanic from Southern California, regardless of whether he is a gang member, who “comes into the jail. . . falls under the control of the Southside. And they have to follow the [Southside] rules.” “Paisa,” “Resident,” and “Christian” are “designation[s] by the Southside of a person who is not a member of the Southside but has to follow the rules.” When Tobias arrived at Dorm 816, Vega informed him of the rules.
Vega testified that in June 2008, when the incident involving Tobias occurred, he was the “bar man” for Dorm 816. Deputy Hardiman defined *836 “bar man” as “a person within the Southside who is designated to be a contact point in a dorm with the staff of the facility.” The bar man also “communicates with the hierarchy of the Southside.” The bar man sometimes “give[s] out the orders about who gets beat up, who gets kicked
Raymond Cuevas worked for Hardiman as an informant. His gang moniker was “Puppet.” When Vega told Tobias that someone wanted to speak to him upstairs, Tobias understood that he was going to see “Puppet,” “who would give orders about who should get beat up and what should happen among the gang members . . . .” Hardiman testified that in about August 2009 Cuevas became “the shot caller for the entire facility . . . .” Cuevas said that “Vega had status within the Southside and eventually became the shot caller for the entire facility . . . .” Deputy Christian Lopez, who worked at NCCF and had frequent contact with Vega, testified that Vega had “worked his way up from bar man” to “facility shot caller, for a short period of time” between October and December 2009.
Deputy Hardiman saw “roll call lists,” which were generated by Southside and listed its members as well as inmates under its control. Vega’s, Miranda’s, and DeLeon’s names were on the lists. Rangel “appear[ed] on roll calls with [his] name, booking number, and moniker [“Evil”] and [local street] gang.”
The prosecutor asked Deputy Hardiman a hypothetical question incorporating the facts of the assault committed upon Tobias. Deputy Hardiman opined that the assault “was committed at the direction of, for the benefit [of], and in association with a criminal street gang, to wit, the Southside.” Hardiman explained that the assault benefited Southside because “it tells both other Southsiders, people that aren’t Southsiders but fall under the control of the Southside, and the other groups within the jail—like the black inmates, the white inmates . . .—that the Southside is ... so strong and so committed that they’re willing to attack their own because their own in this instance wouldn’t follow their rules.” This creates fear and intimidation among other inmates and “causes [Hispanic inmates] to follow the rules.” The fear and intimidation deter “other organizations from hying to influence or stick their nose into the interests of the Southside, such as extortion, money laundering, drug dealing.”
Vega testified that he was a member of a gang called Pacoima Project Boys, not a gang called Southside. “Sureño” or “Southside” means “like saying you’re from Southern California.” Vega claimed that Tobias had said he was a member of the Langdon Sheet gang in the San Fernando Valley.
*837 Rangel testified that he was a member of a gang called Compton Varrio Tres. He identified himself as a “Sureño,” which means a “gang member from the south” of California.
DeLeon testified that, when he “was younger,” he had been a member of a gang called La Mirada Locos. But DeLeon told Vega that he was a current member of the La Mirada gang. Vega heard other inmates address DeLeon by his gang moniker, “Capone.” DeLeon testified that “Southsiders” means “Hispanic from down south.” He was asked, “[Is] everyone who is Hispanic who is a member of a gang south of Delano, a member of Southside?” DeLeon replied, “Only when you’re in jail.”
Miranda did not testify. Deputy Hardiman opined that Miranda had “a leadership rol[e] within [the] San Fer” criminal street gang in the San Fernando Valley. Miranda told Vega that he was from San Fer.

Expert Gang Testimony

Miranda and Rangel assert that the evidence is insufficient to support the gang enhancements because Deputy Hardiman’s “conclusions were spun out of whole cloth” and “are not worthy of any assignment of value or credibility.” They allege that his “conclusions are based upon matters which are not reasonably relied upon by other experts, and upon factors which are speculative, remote or conjectural.” (Boldface & capitalization omitted.)
Miranda and Rangel impugn Deputy Hardiman’s gang expertise. They claim that he “concluded South Side was a criminal street gang, upon his arrival at the Los Angeles County Sheriff’s Department, without any prior gang experience or training.” They also impugn his motives, accusing him of going over the head of his superior, Sergeant Meade, to “OSJ leader[,] Gregory Thompson, soon to be indicted on corruption then occurring at the jail, to test the waters and in so doing, to advance up the ladder.”[4] They attempt to tarnish Hardiman’s character by linking him with Thompson: “This self[-]made expert climbed up the ladder after 7 months at OSJ with the blessings of its leader at a time when the FBI was investigating corruption at the jail which led to conviction of its OSJ leader.”
For four reasons, we reject Miranda’s and Rangel’s allegations concerning Deputy Hardiman’s testimony. First, they are not supported by meaningful analysis with record citations to evidence before the jury. (In re S.C. (2006) 138 Cal.App.4th 396, 408 [41 Cal.Rptr.3d 453].) Second, by not objecting to *838 Hardiman’s qualifications as a gang expert, Miranda and Rangel forfeited this issue. (People v. Bolin (1998) 18 Cal.4th 297, 321 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Third, Hardiman’s credibility was a matter for the jury to decide, and it impliedly found him to be credible. “ ‘ “Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]” . . . .’ [Citation.]” (People v. Barnes (1986) 42 Cal.3d 284, 306 [228 Cal.Rptr. 228, 721 P.2d 110].)
Fourth, Hardiman’s “conclusions were [not] spun out of whole cloth.” Nor were they based on speculation. Hardiman listened to a recorded “face-to-face conversation” between Miranda and two other inmates “about the conduct and operations of the Southside.” Miranda had a “ ‘thirst for blood’ tattoo,” which is “an earned tattoo within the Southside.” Hardiman’s opinion that Vega was a member of Southside was based on “his actions, his conduct,” his tattoos, “admissions that he made to Deputy Christian Lopez,” and Hardiman’s conversations with the informant Raymond Cuevas. Hardiman conversed with Cuevas “at least 30 times.” In addition to having been the Southside “shot caller for the entire facility,” Cuevas was also “a crew chief for a member of the Mexican Mafia.” Hardiman was familiar with the “Southside rules” in force at NCCF. He saw “hundreds” of Southside “roll call lists,” some of which included appellants’ and DeLeon’s names. He spoke to “hundreds of Southsiders” and to several members of the Mexican Mafia, plus more than 100 “dropouts” from the Mexican Mafia and Southside. He listened to “hundreds of hours of recorded conversations . . . between Southsiders talking to other Southsiders and . . . sometimes members of the Mexican Mafia about their criminal enterprise.” He spoke to police officers who were working in an undercover capacity within the Mexican Mafia or Southside.
Hardiman’s conclusions are supported by Tobias’s and codefendant DeLeon’s testimony. When Tobias arrived at Dorm 816, Vega told him that “they were working for the South” and explained the rules to him. DeLeon testified that Southern California Hispanic local gang members are members of Southside “[o]nly when [they are] in jail.”
Hardiman’s conclusions are also supported by the nature of the attack upon Tobias. The attack involved concerted, apparently preplanned action by members of different local street gangs against an inmate who had refused to follow the command of a Southside “shot caller.”
Appellants argue that the Los Angeles County Sheriff’s Department’s “classification system created a gang it called South Sider making membership mandatory” for “any Hispanic geographically from southern California *839 regardless of whether or not he was a gang member before incarceration This constituted “an unlawful classification system which was based on ethnicity.” “In the context of whether a finding is supported by substantial evidence, opinion evidence based on ethnic discrimination is not reasonable, credible, and of solid value.”
Appellants’ argument is not supported by the evidence. Hardiman testified that, upon entry into the Los Angeles County jail, only Southern California Hispanic gang members become members of Southside. Incarcerated Southern California Hispanics who are not gang members are not members of Southside, although they “fall[] under [its] control.” “[Y]ou really don’t have to be a member of a street gang to be subject to the power [Southside] hold[s] over you
The sheriff’s department did not create Southside. Southside was created by the Mexican Mafia. Hardiman testified: “[T]he Sheriff’s Department doesn’t designate anybody as a Southsider. That’s for the Southside and for the individual.”

Elements of Statutory Definition of a Criminal Street Gang

Vega and Rangel claim that the evidence is insufficient to establish the elements of the statutory definition of a criminal street gang. “ ‘[Criminal street gang’ means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [statutorily enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.” (§ 186.22, subd. (f).)

Common Name or Common Identifying Symbol

Vega and Rangel assert that “Southside did not have its own unique symbolism. Rather, it used the same iconic Mayan imagery and the number 13 used by the Mexican Mafia.” But the gang statute does not require “unique” symbolism. It requires only a “common identifying sign or symbol.” (§ 186.22, subd. (1).) Furthermore, the statute provides that a criminal street gang must have “a common name or common identifying . . . symbol,” not both. (§ 186.22, subd. (1), italics added.) Either is sufficient. Deputy Hardiman testified that the Southside gang had a common name: the terms “Sureño, Sur, Southside, [and] Southsider” were all “synonymous” with the gang. “Sur” is Spanish for “south,” and “Sureño” is Spanish for “a person who is from the south.” Southside also had a “common identifying . . . symbol.” (Ibid.) It had “a symbol called the Kampol, . . . which is two *840 horizontal lines with three dots above the horizontal lines which is a Mayan representation of the number 13.” The 13th letter of the alphabet is ‘“M which stands for the Mexican Mafia. Hardiman’s testimony constitutes substantial evidence of “ ‘a common name or common identifying . . . symbol.’ ” (People v. Gardeley (1996) 14 Cal.4th 605, 620 [59 Cal.Rptr.2d 356, 927 P.2d 713] [gang expert’s testimony was sufficient to satisfy most of the elements of definition of a criminal street gang, including that the gang ‘“shares ‘a common name or common identifying . . . symbol’ ”].)

Primary Activities

Vega and Rangel maintain that the evidence is insufficient to show that ‘“one of [Southside’s] primary activities” was ‘“the commission of one or more” of the “criminal acts” enumerated in the gang statute. (§ 186.22, subd. (f).) Deputy Hardiman testified that the “most common” activities of Southside were “extortion, drug dealing, assault with deadly weapons, [and] conspiracies to [commit] murder.” These activities are among the criminal acts enumerated in the statute. (§ 186.22, subd. (e)(1), (3), (4), (19).) Deputy Hardiman’s testimony constitutes substantial evidence of the “primary activities” element of the definition of a criminal street gang. (People v. Prunty (2015) 62 Cal.4th 59, 82 [192 Cal.Rptr.3d 309, 355 P.3d 480] [gang expert’s testimony “that ‘the Norteños’ in the area engage in various criminal practices” was “likely sufficient” to establish “primary activities” element]; People v. Sengpadychith (2001) 26 Cal.4th 316, 324 [109 Cal.Rptr.2d 851, 27 P.3d 739]; see People v. Gardeley, supra, 14 Cal.4th at p. 620.)

Pattern of Criminal Gang Activity

Finally, Vega and Rangel allege that the evidence is insufficient to show that Southside “members individually or collectively engage in or have engaged in a pattern of criminal gang activity.” (§ 186.22, subd. (f).) The prosecution has “the choice of proving the requisite ‘pattern of criminal gang activity’ by evidence of ‘two or more’ predicate offenses committed ‘on separate occasions’ or by evidence of such offenses committed ‘by two or more persons’ on the same occasion.” (People v. Loeun (1997) 17 Cal.4th 1, 10 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) The prosecution may “rely on evidence of the defendant’s commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member.” (Ibid.)
The People contend that the predicate offenses were sufficiently proved by Hardiman’s testimony that two other named individuals had been convicted of assault with a deadly weapon and murder and had committed these crimes while they were members of Southside, although they were also members of *841 different local criminal street gangs. Hardiman was the investigating officer in the assault with a deadly weapon case and testified at the trial in the murder case. The People also contend that the predicate offenses requirement was proved by all of appellants’ contemporaneous commission of the charged offenses. (See People v. Loeun, supra, 17 Cal.4th at p. 14 [“Through evidence of defendant’s commission of the charged crime of assault with a deadly weapon on Ivan Corral and the separate assault on Corral seconds later by a fellow gang member, the prosecution established the requisite ‘pattern of criminal gang activity’ ”].)
But appellants argue that the evidence is insufficient to show that they and the two other named individuals belonged to the same “umbrella” Southside gang. “[I]t is axiomatic that those who commit the predicate acts must belong to the same gang that the defendant acts to benefit.” (People v. Prunty, supra, 62 Cal.4th at p. 76.) Where, as here, “the prosecution’s case positing the existence of a single ‘criminal street gang’ [Southside] for purposes of section 186.22(1) turns on the existence and conduct of one or more gang subsets [the different local street gangs at NCCF], then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization .... Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together.” (Id. at p. 71.) The associational or organizational connection may be “formal or informal.” (Id. at p. 74.) The People acknowledge that the different Southern California Hispanic local criminal street gangs at NCCF “were subsets of South Side.”
“The most straightforward cases [of an associational or organizational connection] might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements. Evidence could be presented, for instance, that such subsets are part of a loose approximation of a hierarchy. Even if the gang subsets do not have a formal relationship or interact with one another ... the subsets may still be part of the same organization if they are controlled by the same locus or hub. For example, Norteño gang subsets may be treated as a single organization if each subset contains a ‘ “shot caller[]” ’ who ‘answer[s] to a higher authority’ in the Norteño chain of command. [Citations.]” (People v. Prunty, supra, 62 Cal.4th at p. 77.)
The evidence here shows that this is one of “[t]he most straightforward cases” of an associational or organizational connection. (People v. Prunty, supra, 62 Cal.4th at p. 77.) The Southern California Hispanic gang *842 subsets at NCCF were “controlled by the same locus or hub.” (Ibid.) Deputy Hardiman described in detail the “pyramid-like structure of leadership within the jail that controls the actions of the individual Southsiders,” with a Mexican Mafia member at the top and Southside shot callers at different levels of the pyramid. The subset gang members were governed by “a set of rules” called “the Southside rules.” “[P]roof that different Norteño subsets are governed by the same ‘bylaws’ may suggest that they function . . . within a single hierarchical gang. [Citation.]” (Ibid.)
In proving the requisite associational or organizational connection, prosecutors may “show that members of the various subsets collaborate to accomplish shared goals.” (People v. Prunty, supra, 62 Cal.4th at p. 78.) The prosecutor in the instant case made such a showing. When Tobias arrived at Dorm 816, Vega told him that, “since they were working for the South, there was no fighting among them.” Prosecutors may establish collaboration by showing “that members of different subsets have ‘work[ed] in concert to commit a crime,’ [citation] . . . .” (Id. at p. 78, fn. omitted.) Here, the evidence shows that members of different gang subsets worked in concert to commit the aggravated assault upon Tobias. The subsets were “united by their activities.” (Id. at p. 75.)
Accordingly, “ ‘ “viewing the evidence in the light most favorable to the People” ’ ” and “presuming] in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence” (People v. Lindberg (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664]), we conclude that a reasonable trier of fact could have found beyond a reasonable doubt “that those who commit [ted] the predicate acts . . . belonged] to the same gang that [appellants] act[ed] to benefit” (People v. Prunty, supra, 62 Cal.4th at p. 76).
[[]]*

Disposition

The convictions on count 2 are vacated and the sentences on counts 1 and 3 are reversed. The matter is remanded to the trial court with directions to *843 resentence appellants on counts 1 and 3 in accordance with this opinion. The court shall calculate Vega’s and Rangel’s custody credits. In all other respects, the judgments are affirmed.
Gilbert, P. J., and Perren, J., concurred.
A petition for a rehearing was denied September 19, 2016, and the petitions of all appellants for review by the Supreme Court were denied November 30, 2016, S237452.

 All statutory references are to the Penal Code unless otherwise stated.

See footnote, ante, page 829.

 Centeno, Paredes, and Toscano were appellants’ codefendants. They pleaded guilty before trial. In the unpublished portion of this opinion, we reject appellants’ contention that the trial court erroneously refused their' request to take judicial notice, in the jury’s presence, of the guilty pleas.

 “OSJ” is an abbreviation for Operation Safe Jails, “an intelligence-gathering unit within the Los Angeles County jail system.”

See footnote, ante, page 829.