Filed 8/17/21  P. v. Eales CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092330 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE010824) |
| v. | |
| TERRY PARKER EALES, | |
| Defendant and Appellant. | |

A jury found defendant Terry Parker Eales and his codefendant Justin Von Jorn guilty of second degree robbery and assault with force likely to produce great bodily injury.  The jury found both defendant and Jorn committed the crimes for the benefit of the Norteño gang.  On appeal, defendant argues insufficient evidence was presented at trial to support the gang enhancement and the trial court erred when instructing the jury on the elements of the gang enhancement and the reliability of eyewitness testimony.  We disagree and affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *The Offense*

Rueben V. lived on Fairfield Street in Sacramento and identified as a Norteño gang member, but had predominantly associated with other Norteño gang members in the Bay Area. In May 2016, Rueben regularly sold drugs. Defendant and Jorn knew each other and frequented the neighborhood where Rueben lived. Defendant was a member of the Varrio Garden Land subset of the Norteño gang and Jorn was a member of the Varrio Diamond Sacra subset of the Norteño gang. On multiple occasions, defendant and Jorn approached Rueben demanding Rueben pay taxes to the Norteño gang in connection with his drug sales. Rueben refused and did not pay taxes.

On or about May 18, 2016, defendant and Jorn assaulted Rueben and stole money from him. The encounter was captured on a surveillance camera positioned on the house across the street from the assault. No one saw the assault as it happened, and the recording did not clearly portray the captured images. After reviewing the video of the assault, two residents of the neighborhood identified defendant as one of the perpetrators. Both neighbors had known defendant for years and had regularly seen him around the neighborhood. They were 100 percent sure defendant was one of the perpetrators.

### II

### *Gang Evidence*

The Norteño gang was created as a street-level offspring of the Nuestra Familia prison gang. The Norteño gang is divided into multiple street-level subsets, defined predominantly by neighborhood. In Sacramento County there are at least 20 subsets of the Norteño gang. These subsets sometimes work together and have strong ties. For instance, families commonly include individuals from various subsets. While, at other times, subsets are rivals. When members of Norteño subsets find themselves in a county jail, however, they tend to put their differences aside and commit jail-level crimes

2

together.  Depending on the leadership of a particular subset, it is common for subsets to pay taxes from their street-level criminal activity to Norteño members in jail.  Paying taxes is enforced by experienced and established gang members.

Upon entering a county jail, inmates are asked whether they have housing constraints.  If an inmate claims to be part of the Norteño gang or one of its street-level subsets, the inmate is housed with other Norteño gang members.  Once housed together, the internal politics of the Norteño structure take over and inmates (or "soldiers," as they are called) take part in "programming."  "Programming" consists of following the gang's protocols, such as morning work, smuggling drugs in and out of jail, or committing other crimes at the direction of leadership.  Typically, there is an overall authority in charge, who acts as the top person in the Norteño jail hierarchy and directs the Norteño inmates.  The overall authority in charge is typically a person who has experience and knows the structure of the Norteño gang and members coming into custody.

Defendant was an active member of the Varrio Garden Land Norteño subset since as early as 2006 and Jorn was an active member of the Varrio Diamond Sacra subset since as early as 2002.  While located in separate county jail housing facilities pending trial, both defendant and Jorn became the overall authority in charge of the Norteño gang members housed in their respective facilities.  Defendant was searched on multiple occasions and was found to be in possession of over 50 huelas (or Norteño-related notes), over 10 grams of drugs, and jail-manufactured weapons.

Regarding the huelas, each one was labeled according to the contents of the note.  For example, the huela labeled "*finances*" pertained to the selling of narcotics and paying of taxes.  The huela specified that collected taxes were to go up the command structure with a third of the profits going to the larger Norteño gang.  The huelas labeled "*Roster*" had names of gang members, their monikers, their subsets, their dates of birth, and their county jail or state prison reference numbers.  One huela labeled "*Roster*" listed defendant at the top with his moniker as "*KO*," his subset as "*VGL Sacra*," meaning

Varrio Garden Land, his date of birth, his county and prison identification numbers, and his pending charges.  The "*NF Timeline*" huela described the history of the Norteño gang since 1958.  The huela titled "*Norteño Format*" provided the structure of the Norteño gang, while another addressed the scope of authority of the gang.  Other huelas described different practices of bringing drugs into jail.

## III

### *Verdict And Sentencing*

The jury found defendant and Jorn guilty of second degree robbery and assault with force likely to produce great bodily injury.  The jury further found the gang enhancement attached to each of those convictions true.  The trial court sentenced defendant to the upper term of five years for the robbery, plus 10 years for the associated gang enhancement.  It did not sentence defendant on the assault conviction or its associated gang enhancement, instead staying the sentence under Penal Code[1] section 654.

Defendant appeals.

## DISCUSSION

## I

### *Sufficient Evidence Supports The Gang Enhancements*

Defendant challenges the sufficiency of the evidence supporting his gang enhancements on two grounds.  First, he contends insufficient evidence showed an organizational connection between his subset and the Norteño gang.  Second, he contends insufficient evidence showed a connection between his subset and the two predicate offenses.

---

[1]     Further section references are to the Penal Code unless otherwise indicated.

" ' "We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." [Citation.]' [Citation.] 'The question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Miranda* (2016) 2 Cal.App.5th 829, 834.) We do not reweigh the evidence or reevaluate witness credibility. (*Ibid.*)

To establish that a group is a criminal street gang, the prosecution must prove, among other things, that the group is an "ongoing organization, association, or group of three or more persons, whether formal or informal . . . , having a common name or common identifying sign or symbol." (§ 186.22, subd. (f); *People v. Prunty* (2015) 62 Cal.4th 59, 71.) An "organization, association, or group" within the definition of " 'criminal street gang' " set forth in section 186.22, subdivision (f), requires evidence showing an "organizational or associational connection" uniting the " 'group' " members. (*Prunty*, at p. 85.) Thus, our Supreme Court in *Prunty* held that "when the prosecution seeks to prove . . . a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Id*. at pp. 67-68.)

Our Supreme Court held that the requisite associational or organizational connection uniting subsets and the umbrella gang can be proven by various types of evidence, but did not dictate a particular type of evidence to satisfy the required showing.

5

Several examples supplied by our Supreme Court are suggestive of proof that could establish a vertical connection between a subset and an umbrella gang: (1) evidence of "collaboration or organization, or the sharing of material information"; (2) "the prosecution may show that . . . subset members exhibit behavior showing their self-identification with a larger group" -- "behavior demonstrating a shared identity with" a larger organization; (3) the subset is "controlled by the same locus or hub," e.g., the subset "contains a ' "shot caller" ' who 'answers to a higher authority' in the Norteño chain of command"; (4) the activities of the subset "benefit the same (presumably higher ranking) individual or group," e.g., sharing drug sale proceeds with the umbrella group or an associated prison gang; (5) governance by the same bylaws; and (6) the subset employs the "same initiation activities." (*People v. Prunty*, *supra*, 62 Cal.4th at pp. 71, 73-74, 77-80.)

The *Prunty* court was careful to note that the words " 'formal or informal' " in section 186.22, subdivision (f), suggest that "the prosecution need not show that the relationship between subsets and a larger organization resembles, for example, the stereotypical organized crime syndicate's hierarchical, tightly organized framework." (*People v. Prunty*, *supra*, 62 Cal.4th at p. 73.) But "it is not enough . . . that the group simply shares a common name, common identifying symbols, and a common enemy." (*Id*. at p. 72.) The "group must be united by more than shared colors, names, and other symbols." (*Id*. at p. 74.) Further, ideological commonalities are insufficient in and of themselves. "Shared ideology is a poor proxy for whether a group in fact exists." (*Id*. at p. 75.) Nor is the fact that the subset engages in similar conduct sufficient without demonstrating that the subset is somehow connected to the larger group. (*Id*. at p. 72.) The prosecution's evidence must "allow the jury to reasonably infer that the 'criminal street gang' the defendant sought to benefit -- or which directed or associated with the defendant -- included the 'group' that committed the primary activities and predicate offenses." (*Id*. at p. 76.)

6

The evidence established that defendant, a long time Varrio Garden Land gang member, assaulted and robbed Rueben because Rueben refused to pay taxes to the larger Norteño gang. The evidence also established that the larger Norteño gang asserted its presence in the jail system and committed criminal activity, such as drug sales, in the jails. A third of all money earned by a member of a Norteño subset or gang typically trickled up the chain to the larger Norteño gang in the jails. Not all subsets participated in the tax system and whether taxes were paid depended on those in charge of any given subset. After the crimes took place and defendant was arrested, he went to jail and claimed membership in the Norteño gang and eventually became the overall authority in charge of his housing unit, responsible for coordinating drug sales and "programming" all Norteño gang members in his housing unit. Indeed, defendant was caught with drugs and huelas discussing best practices for drug smuggling in jail, as well as huelas providing a detailed accounting of Norteño gang members serving time in jail.

From this evidence, it is clear defendant committed the crimes for the benefit of the Norteño gang because he sought to compel another Norteño gang member to participate in the tax system commonly practiced among Norteño street-level subsets and described in jail-level Norteño huelas. Further, it is clear defendant actively participated in the Norteño structure upon entering the jail system and committed crimes on its behalf while there. Still, defendant asserts the evidence is insufficient because, while it established he participated in the larger Norteño gang, there was no evidence establishing his subset could be considered the same gang as the Norteño gang. Not so. As the gang expert testified, the paying of taxes to the larger Norteño gang is dependent upon the leadership of a given subset. Given this testimony and the fact defendant was a long time gang member who participated in the Norteño structure inside of jail by becoming an overall authority in charge and outside of jail by collecting taxes, a reasonable jury could infer that defendant participated in the larger Norteño gang because it was the practice of his subset. Thus, sufficient evidence demonstrated a connection between the Norteño

gang and the Varrio Garden Land subset such that they may be considered the same group.

The prosecution's evidence must "allow the jury to reasonably infer that the 'criminal street gang' the defendant sought to benefit -- or which directed or associated with the defendant -- included the 'group' that committed the primary activities and predicate offenses." (*People v. Prunty*, *supra*, 62 Cal.4th at p. 76.)  Here, the prosecution alleged defendant and Jorn acted to benefit the Norteño gang and pointed to a predicate offense committed by a Varrio Garden Land subset gang member and another predicate offense committed by a Varrio Diamond Sacra subset gang member in association with a Varrio Franklin Boulevard subset gang member.  The prosecution's burden was to demonstrate that the Norteño gang defendant benefited included the Varrio Garden Land subset, and also that the Norteño gang included the Varrio Diamond Sacra subset or the Varrio Franklin Boulevard subset as those who committed the other predicate offense. The prosecution was not required to demonstrate the Varrio Garden Land subset was the same group as the Varrio Diamond Sacra subset or the Varrio Franklin Boulevard subset, only that all of those subsets were part of the Norteño gang defendant sought to benefit through his criminal conduct.

Defendant's reliance on *People v. Cornejo* (2016) 3 Cal.App.5th 36 is misplaced. There, we determined insufficient evidence supported a gang enhancement because the predicate offenses relied upon to show the existence of a Norteño gang were committed by two subsets neither of which were shown to be connected to defendants' subset or shown to be connected with the overarching gang the defendants sought to benefit.  (*Id.* at pp. 47-48.)  Here, the members of the Varrio Diamond Sacra subset, who committed one predicate offense, was also involved in the crimes charged because Jorn was a member of that subset.  Further, the prosecution demonstrated Jorn's subset was linked to the Norteño gang defendant benefited the same way defendant's gang was linked to the Norteño gang -- through the paying of taxes and adherence to the Norteño structure in

8

and outside of jail. Thus, to the extent defendant argues the prosecution was required to establish a link between his subset and the Varrio Diamond Sacra subset and the Varrio Franklin Boulevard subset, that claim lacks merit.

II

*The Trial Court Properly Instructed On The Elements Of The Gang Enhancements*

Defendant contends the jury instruction on the gang enhancements failed to accurately describe the elements the prosecution had to establish because it did not explicitly inform the jury it had to find an organizational connection between defendant's and Jorn's subsets and the Norteño gang. We disagree.

A criminal defendant has a right to accurate instructions on the elements of a charged crime or allegation. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) "As a general rule, in the absence of a request for amplification, the language of a statute defining a crime . . . usually is an appropriate basis for an instruction. If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning. If, however, a word or phrase is used in a technical sense differing from its commonly understood meaning, clarifying instructions are appropriate and should be given on the court's own motion." (*People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547; accord, *People v. Krebs* (2019) 8 Cal.5th 265, 331 [" '[w]hen a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request' " ' "].) We review de novo whether an instruction accurately states the law. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

The trial court instructed the jury on the elements of the gang enhancement with CALCRIM No. 1401, which stated, in relevant part: "If you find the defendants guilty of the crimes charged in Count Five or Six or the lesser crime in Count Five, you may -- must then consider -- you must then decide whether for each crime the People have

9

proved the additional allegation that the defendant committed that crime for the benefit of or in association with a criminal street gang. [¶] You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] . . . [¶] To prove this allegation the People must prove: [¶] 1. The defendant committed the crime for the benefit of or in association with a criminal street gang; and [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members. [¶] A 'criminal street gang' is any ongoing organization, association, or group of three or more persons, whether formal or informal: [¶] 1. That has a common name or common identifying sign or symbol. [¶] 2. That has, as one or more of its primary activities, the commission of robbery . . . , narcotics sales . . . , or assault . . . , and [3.] whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity." Defendant did not object to the giving of CALCRIM No. 1401 or request any clarifying language.

This instruction tracked the language of section 186.22, subdivision (f). In *Prunty*, our Supreme Court construed the phrase "organization, association, or group . . . , whether formal or informal," as used in that subdivision, as "contemplat[ing] some kind of relationship, or degree of togetherness, uniting those individuals." (*People v. Prunty*, *supra*, 62 Cal.4th at p. 72.) Our Supreme Court did not ascribe a technical meaning to the statutory language, but rather relied on the common understanding of those terms as reflected in dictionary definitions. (*Id*. at pp. 72-73.) Our Supreme Court also rejected the argument that it was adding " 'an element to the statute that the Legislature did not put there,' " and made clear it was merely interpreting the words of section 186.22, subdivision (f). (*Prunty*, at p. 76, fn. 4.) Accordingly, as reflected by our Supreme Court, the phrase "ongoing organization, association, or group . . . , whether formal or informal" does not have a technical meaning different from its commonly understood meaning.

10

Because the trial court properly instructed the jury on the elements of the gang enhancements, defendant's claim the trial court inaccurately instructed the jury lacks merit. If defendant wished for the instruction to contain more detail or elaborate on the definition of a criminal street gang, he needed to request a pinpoint instruction. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348 [" ' "[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language" ' "]; *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [same]; see also *People v. Anderson* (2011) 51 Cal.4th 989, 997-998 [court is not required to give pinpoint instructions sua sponte]; *People v. Saille* (1991) 54 Cal.3d 1103, 1117 [" ' "pinpoint" instructions are not required to be given *sua sponte* and must be given only upon request' "].)

III

*The Trial Court Did Not Violate Defendant's Due Process Rights By Instructing With CALCRIM No. 315 Pertaining To The Reliability Of Eyewitness Identification*

The jury was instructed with CALCRIM No. 315 in that, when determining the reliability of a witness's identification of a defendant as the perpetrator of the crimes, the jury should consider, among other things, the certainty of the witness's identification. Defendant contends this instruction violated his due process rights because "modern social science research has demonstrated there is no correlation between a witness's certainty of identification and its reliability." We disagree.

First, defendant did not challenge the relevant language in the trial court. As our Supreme Court has explained, a defendant's failure to request a modification of an instruction on eyewitness certainty in the trial court forfeits the ability to challenge the instruction on appeal. (*People v. Sanchez* (2016) 63 Cal.4th 411, 461-462 [with respect to a challenge to the witness certainty language in the predecessor instruction to

11

CALCRIM No. 315, the defendant's challenge to the inclusion of the certainty language was forfeited because the defendant did not request a modification of the instruction].)

Second, while this appeal was pending, our Supreme Court issued *People v. Lemcke* (2021) 11 Cal.5th 644, which rejects the precise argument presented by defendant. In *Lemcke*, when considering a due process challenge to the witness certainty language in CALCRIM No. 315, our Supreme Court found it significant that the defendant was able to present expert evidence about eyewitness identification, and that the jury was instructed that " '[p]eople sometimes honestly . . . make mistakes about what they remember,' " and that it was responsible for " 'judg[ing] the credibility or believability of the witnesses.' " (*Lemcke*, at p. 658.) Further, *Lemcke* noted that in the instruction on eyewitness identification, the jury was instructed that " '[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.' " (*Ibid*.) In that context, our Supreme Court held "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id*. at p. 661.)[2]

Here, where defendant, like the defendant in *Lemcke*, was free to present his own expert evidence on eyewitness identification and the jury was given the specific instructions on witness testimony and the burden of proof that our Supreme Court in *Lemcke* found to be significant in alleviating any due process problem, there is no merit

---

[2] Although not relevant to our evaluation of defendant's argument, we note that our Supreme Court in *Lemcke* stated it "believe[s] there is a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy," and it thus "direct[ed] . . . trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*People v. Lemcke*, *supra*, 11 Cal.5th at p. 669.)

in defendant's contention that his right to due process was violated by the inclusion of language regarding witness certainty in CALCRIM No. 315.

## DISPOSITION[3]

The matter is remanded for the trial court to impose a sentence on defendant's conviction for assault by means of force likely to produce great bodily injury and the associated gang enhancement before staying the imposed sentence pursuant to section 654. The judgment is otherwise affirmed.

/s/_____
Robie, J.

We concur:

/s/_____
Blease, Acting P. J.

/s/_____
Renner, J.

---

**3**     The trial court failed to impose a sentence on defendant's conviction for assault with force likely to cause great bodily injury before staying the sentence on that conviction pursuant to section 654. This was error. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1466.) "[W]hen a trial court determines that section 654 applies to a particular count, the trial court must impose sentence on that count and then stay execution of that sentence." (*Ibid.*)