Filed 9/28/21  In re T.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re T.W., a Person Coming Under the Juvenile Court Law. | |
| | D077336 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J241574) |
| v. | |
| T.W., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kathleen M. Lewis and Peter C. Deddeh, Judges.  Affirmed, as modified.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

After he was declared a ward of the court and placed on probation for a misdemeanor offense, 15-year-old T.W.—an Emerald Hills Blood gang member—and two other minors murdered Ishi Hampton. T.W. was charged with first degree murder and conspiracy to commit murder. (Pen. Code, §§ 187, subd. (a), 182, subd. (a)(1).)[1] The murder and conspiracy to commit murder were alleged to have been committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)) and it was further alleged that at least one principal used a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)). After the murder, but before he was apprehended, T.W. was alleged to have committed two robberies.

In response to a petition alleging the two robberies, T.W. admitted one count of grand theft. (Pen. Code, § 487, subd. (c).) The juvenile court found true the murder and conspiracy to commit murder allegations, as well as the gang and firearm enhancement allegations. The court subsequently dismissed the petition alleging the robbery counts (Welf. & Inst. Code, § 782), then continued T.W. as a ward of the court (*id.*, § 602), placed him under the supervision of the probation officer, and committed him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ).[2]

On appeal, T.W. contends the gang expert testimony and certified records that were used to prove six predicate offenses were improperly based on inadmissible, case-specific hearsay. We conclude any error was not

---

[1]     Unless otherwise indicated, statutory citations are to the Penal Code.

[2]     "DJJ is also known as the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF). DJJ/DJF is the current name of the former California Youth Authority." (*In re N.C.* (2019) 39 Cal.App.5th 81, 85, fn. 3.)

prejudicial because other admissible evidence supported the finding that Emerald Hills gang members committed at least two predicate offenses needed to support the gang enhancement.

T.W. further contends his DJJ commitment was improper because his "latest crime"—grand theft—was not a qualifying offense under Welfare and Institutions Code section 733, subdivision (c).  We reject this contention because the juvenile court dismissed the relevant petition under Welfare and Institutions Code section 782, leaving the DJJ qualifying offense of murder, and we find no abuse of discretion in the court's decision to do so.

T.W. further contends section 654 prohibits punishment for both the murder and conspiracy to commit murder and that the 10-year enhancements under section 186.22, subdivision (b)(1)(C) must be stricken.  We agree with these contentions, modify the judgment to stay punishment on the conspiracy count, strike the 10-year enhancements under section 186.22, subdivision (b)(1)(C) and clarify that section 186.22, subdivision (b)(5) applies and imposes a minimum term of 15 years before T.W. may be considered for parole.  We affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Petitions*

On January 16, 2019, the People filed an amended petition alleging T.W. committed robbery (§ 211; count 1), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), and a misdemeanor count of giving false information to a peace officer (§ 148.9, subd. (a); count 3).  The offenses were alleged to have occurred on August 16, 2018.  T.W. admitted the misdemeanor (count 3), and the People moved to dismiss counts 1 and 2.  The juvenile court declared T.W. a ward of the court and placed him on probation.

3

On May 30, 2019, the People filed a second petition alleging that T.W. committed murder (§ 187, subd. (a); count 1) and conspiracy to commit murder (§ 182, subd. (a)(1); count 2). The murder was alleged to have occurred on May 2, 2019. The petition alleged, as to both counts, that T.W. committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)) and that at least one principal used a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)).

On December 11, 2019, the People filed a third petition alleging T.W. committed two counts of robbery.[3] (§ 211.) On January 3, 2020, T.W. admitted committing one count of grand theft (§ 487, subd. (c)), and the juvenile court dismissed count 2.[4]

B. *Contested Adjudication Hearing*

In January 2020, the juvenile court conducted a contested adjudication hearing on the second petition regarding the murder allegations.

---

[3] For ease of reference, we refer to the December 11, 2019 petition as the "robbery/grand theft petition." The robberies were alleged to have occurred about two weeks after the murder, but a petition was not filed at that time. However, in December, after repeatedly waiving time on the murder petition, defense counsel withdrew T.W.'s time waiver, triggering T.W.'s release on that petition to home supervision. At that time, the People elected to file a new petition, which allowed the court to order T.W.'s continued detention.

[4] T.W. admitted one count of the lesser included offense of grand theft and informed the court that he understood the other count would be dismissed, the maximum punishment he may receive would be three years of detention, and no other promises had been made to him.

1. *Evidence relating to the murder*

Shortly after midnight on May 2, 2019, T.W. and two other minors, K.W. and E.I., parked in front of an apartment complex on Alvarado Road in San Diego.  They remained inside the car for about six hours.

When the victim, Ishi Hampton, exited his apartment complex and began walking to his car, T.W. got out of the car's passenger side door and began shooting.

Two waste management employees were parked in a garbage truck in front of the apartment complex when they heard gunshots.  They saw the victim running and stumbling as T.W. shot at him repeatedly.  After the victim fell to the ground the first time, he got up again, and the shooter shot him again.  They saw the victim collapse near the front of the building and two young males flee the scene.  The shooter was wearing a tan or red hoodie and jeans, and his companion was wearing a blue hoodie; both had their hoods up.  The employees called for an ambulance and checked on the victim, who did not appear to be breathing.

A woman standing at a nearby trolley station heard gunshots.  She turned to the direction of the sound and saw one young man running and two young men running behind him.  She turned her phone's camera on; the video footage she captured was played in court.

A man getting gas nearby was approached by three young men wearing hoodies and jeans.  One asked if he could borrow the man's phone or get a ride to a friend's house down the street, but the man declined.

A gardener at a nearby school saw three males, two wearing dark hoodies and one in a light-colored shirt, walking briskly toward him.  He told them they needed to leave before the students started to arrive, pointed them

toward the front of the school to exit, and followed them to make sure they left.

Video of the shooting was captured by a nearby security camera. Security footage from various cameras depicted the three minors fleeing the scene, and captured the route they took to escape, past the trolley station, the gas station, and across the school campus. Eventually, they walked to an apartment near the school.

A medical examiner conducted an autopsy and determined Hampton suffered a single gunshot wound to his back. The bullet passed through his organs, including his heart, and lodged in his pectoral muscle.

A crime scene specialist from the San Diego Police Department processed the suspects' vehicle (which they left at the scene) for latent fingerprint and DNA evidence. T.W.'s prints were identified on the exterior passenger side door. K.W.'s prints were identified on the exterior roof of the vehicle. DNA of T.W., K.W., and E.I. was found in the vehicle's interior.

On May 28, T.W. and E.I. were arrested together and placed in the back seat of a patrol car.[5] A recording of their conversation was played in court. T.W. told E.I., "On blood, don't snitch, really bro. . . . It's the car. It has to be. Cuz it was gone," and, "Bro, for murder, bro." T.W. asked E.I., "So, you think Tey9's in there for the same thing?"[6] T.W. said, "I kind a feel like I'm, feel like I should, I'm a see what the thing is, if I, if I plead guilty for

---

[5] A detective informed them they were "both under arrest . . . for murder," read them their rights, and confirmed they understood their rights before leaving them alone in the vehicle.

[6] A gang expert subsequently testified that "Tey9" was K.W.'s gang moniker.

this. I don't know, to be honest . . . . We're fittin' to be here for at least, a minute," and "You think what's his name could be our alibi? Mack-manity?"

In October, a conversation between T.W., E.I., and K.W. was recorded as the minors were transported to juvenile court. K.W. asked T.W., "Did you know we green lighted, Blood? [¶] . . . [¶] By Crabs, by Lincoln niggas, Blood, by the East[.] [¶] . . . [¶] For that shit."

K.W. said he had "seen the video"; T.W. said he had not seen it. The following discussion occurred next:

> K.W.: "You didn't tell us the whole thing, Blood. I didn't know you doubled back, Blood. But . . . ."
>
> T.W.: "I told you that."
>
> E.I.: "Yeah, Blood told us that—Blood could, on the set, the video bro, all you see is you Blood . . . ."[7]

Later in the conversation, K.W. asked,

> "Did your attorney show you the route? That we took?"
>
> E.I.: "Oh yeah, everywhere. Recorded us everywhere. They showed us everywhere. Like, everywhere we've been blood."
>
> T.W.: "Are you talking about the route?"
>
> E.I.: "Yeah, I'm talking about—I'm talking about the route when we ran to. . . . [I]t just happens someone was behind the trash[ ]can recording us."
>
> E.I.: "Yeah, I told you not to take off your . . . . I told you."
>
> T.W.: "No—no you didn't."

---

7    A gang expert testified that, when a gang member said something is " 'on the set,' " they are making a reference to their loyalty to the gang set, saying something is " 'important,' " " 'huge,' " or " 'the truth.' "

E.I.: "Blood, (unintelligible), on the set."

T.W.: "No, you told me to take that shit off."

E.I.: "Ask Blood. You know I did, Blood. 'Cause why would I . . . ."

K.W.: "He did—he did . . . ."

E.I.: "If I told you that I would take off my shit too, Blood."

K.W.: "[L]ook, bro, look when we was at the school, right, I was looking this way. We was walking. (Unintelligible.) All you can see is your tan shirt blood, and your fucking hair, blood."

T.W.: "I had a white shirt."

E.I.: "He had a white shirt."

K.W.: "Oh it looks like it's tan in the video."

A detective from the San Diego Police Department's street gang unit testified that he was familiar with members of the Emerald Hills Blood gang. He observed a music video shot at Emerald Hills Park during a party frequented by Emerald Hills Blood gang members. In the video, he observed the victim Ishi Hampton in the background at the park. The detective testified he thought it was "odd" for Hampton to be at the park that day—the annual gang holiday for the Emerald Hills Blood gang—because he was not known to be an Emerald Hills Blood gang member.

### 2. *Gang expert*

Detective K. Morgan, a detective with the San Diego Police Department's street gang unit, testified as an expert regarding the Emerald Hills Blood gang. She testified she had spent two years working as a patrol officer with the Street Gang Suppression Team (GST) and had also worked in the vice and child abuse units. She testified that she had worked in her

8

current assignment for six months and was charged with monitoring two gangs, one of which was the Emerald Hills Blood gang. During that six-month period, she estimated she had investigated three felony or misdemeanor cases associated with the Emerald Hills Blood gang.

Detective Morgan testified she had contacted members of the Emerald Hills gang when she was on patrol with the GST, and she had arrested and spoken to members of the gang since becoming a detective. Based on her training and experience, as well as her personal contacts with Emerald Hills gang members, Detective Morgan opined the Emerald Hills Blood gang was a criminal street gang within the meaning of section 186.22 because they have more than three members (with 27 known members), a common sign or symbol (the Playboy bunny and the letter U, for " 'uptown' " or " 'upside sic' "), and they commit crimes set forth in section 186.22, subdivision (e) as their primary criminal activity (including murder, assault with a deadly weapon, and robbery).

Detective Morgan testified that the Easter holiday has a special significance for Emerald Hills gang members. Because the gang's symbol is a Playboy bunny, they use Easter (or " 'Bunny Day' ") as a time for "jump[ing] in" new members and celebrating the gang. As part of this celebration, the gang members would meet at the Emerald Hills Park, wear their gang color gray, and "show loyalty to the gang."

Numerous photographs obtained from T.W.'s cell phone and social media accounts were introduced as evidence. The photos depicted T.W., K.W. and others exhibiting gang hand gestures that Detective Morgan opined meant "Uptown Emerald Hills," "upside sic," "fuck neighborhood Crips," and "Crip" or "crab" killer.

9

Based on her review of T.W.'s cell phone information and his social media accounts, which depicted T.W. over a period of time repeatedly throwing up the gang's hand signs, wearing the gang's signature gray color, and posing with a firearm wrapped in a gray bandanna, Detective Morgan opined that T.W. is a member of the Emerald Hills Blood gang.[8] She similarly opined that K.W. is a member of the Emerald Hills Blood gang. She based this opinion on her review of his social media postings and information found on his cell phone. Detective Morgan testified that a gang member's moniker is often a sign of respect, indicating their membership in the gang, and that K.W.'s gang moniker was "Tey9."

When presented with a hypothetical scenario in which two Emerald Hills gang members and an associate drove to an apartment complex, waited outside for six hours, and then shot and killed the victim, Detective Morgan opined that the perpetrators would be committing this crime for the benefit of the Emerald Hills Blood gang with the intent to promote and assist further criminal activity by gang members. She opined that committing such a crime bolstered the individual status of the gang members, proved their loyalty to the gang, improved the gang's status of fear and respect in the community, and prevented witnesses and victims from testifying out of fear of violence. Detective Morgan opined, "Emerald Hills is a smaller gang set than many of the other gangs in San Diego[,] [s]o they have to be hard and brutal to show

---

[8] Detective Morgan testified that, being a Blood gang, the Emerald Hills gang members associated with the color red but used the color gray to signify the Emerald Hills neighborhood. Detective Morgan testified that if someone who was not a member of the gang was seen "throwing up these hand signs, wearing these colors in an Emerald Hills neighborhood," it would be viewed as disrespecting the gang and would result in punishment, including beatings and possibly death.

10

that they're . . . worthy of this status. And that is committing violent crimes such as murder, which is obviously the most heinous crime."

Detective Morgan also reviewed certified copies of court records and testified regarding six predicate offenses committed by three individuals between 2011 and 2017:[9]

(1) Detective Morgan testified she was familiar with Q.A. and his conviction in case number SCD271179 for possession of an unregistered and loaded firearm (§ 25850, subds. (a), (c)(6)) in connection with an incident that took place in 2017.

(2) Detective Morgan testified she was familiar with Q.A.'s convictions in case number SCD273223 for robbery, attempted robbery, and firearm enhancements (§§ 211, 664, 12022.5, subd. (a), 12022.53, subd. (c)) for incidents that occurred in 2016 and 2017. She opined Q.A. was a member of the Emerald Hills Blood gang and explained her opinion was based on her review of the reports in those cases and on speaking with the detective who handled the Emerald Hills gang at the time of the offenses.

(3) Detective Morgan testified she was familiar with L.H. and his conviction for assault with a firearm, with gang and personal use enhancements (§§ 245, subd. (b), 12022.5, subd. (a), 186.22, subd. (b)(1)) in case number SCD265734 in connection with an incident that occurred in 2016.

(4) Detective Morgan further testified she was aware of L.H.'s conviction of possession of a firearm by a felon to benefit and assist gang members (§§ 29800, subd. (a)(1), 186.22, subd. (b)(1)) in case number SCD253170 in connection with an incident that occurred in 2013. She opined

---

[9] The records included charging documents, court minutes, plea agreements, orders granting probation, and verdict forms.

11

that L.H. was a member of the Emerald Hills Blood gang and explained that she based this opinion on the police reports she reviewed and her conversations with the investigating detective.

(5) Detective Morgan testified she was familiar with R.S. and his conviction for possession of a firearm after having been adjudged a ward of the court (§ 12021, subd. (e)) in case number SCD233594 in connection with an incident that occurred in 2011.

(6) Detective Morgan testified she was also familiar with R.S.'s 2012 conviction for murder, attempted murder, assault with a firearm as well as gang and firearm enhancements (§§ 187, subd. (a), 664, 245, subd. (a)(2), 186.22, subd. (b)(1), 12022.53, subds. (b), (c), (d) & (e)(1)) in case number SCD225297 in connection with an incident that occurred in 2009. She opined that R.S. was a member of the Emerald Hills Blood gang based on her review of the case reports and her conversation with the investigating detective.

3. *Defense case and closing arguments*

At the close of the prosecution's case, T.W. declined to present any affirmative evidence in his defense. In closing, the prosecutor argued that the evidence established that Emerald Hills Blood gang was a criminal street gang, the primary activities of which included robbery, assault, and murder, and referenced the six predicate offenses. The prosecutor further argued, "With the elements of [section] 186.22, here we have the defendant in association with another Emerald Hills Blood member[, K.W.,] committing a lying-in-wait murder of an individual that showed up at Emerald Hills Park on 'Bunny Day.' Per the detective's opinion, the only reason the minor and [K.W.] would do this would be to bolster their reputation within the set to show that Emerald Hills is a force to be reckoned with on the street. That they are a legit murdering criminal street gang."

Defense counsel contended the prosecution failed to prove beyond a reasonable doubt that T.W. was the shooter or that the murder was committed "for the gang." Defense counsel requested that the court strike the gun and gang allegations.

4. *Findings*

In January 2020, the juvenile court found the murder and conspiracy to commit murder counts and the attendant enhancements true and sustained the petition. Specifically, the court found:

> "[B]eyond a reasonable doubt that the minor T.W. is guilty of murder in the first degree. That this is a planned killing and could have been charged as lying in wait, again, certainly if he had been in adult court.

> "Also, that this was done in furtherance of a criminal street gang, namely, Emerald Hills. That he personally used the firearm within the meaning of . . . [s]ection 12022.53[, subdivision] (d). That . . . this was in furtherance of a criminal street gang in violation of . . . [s]ection 186.22[, subdivision] (b)(1). And that he's guilty of first degree murder in Count 1 in violation of . . . [s]ection 187.

> "So I also find that he and his cohorts engaged in a criminal conspiracy to commit murder in violation of . . . [s]ection 182[, subdivision] (a)(1). And that also this was done in furtherance of a criminal street gang within the meaning of . . . [section] 186.22[, subdivision] (b)(1). And then, finally, that he personally used a firearm to the meaning of . . . [s]ection 12022.53[, subdivision] (d). And I find that all the allegations are true beyond a reasonable doubt, as well as the substantive charges."

C. *Disposition*

The day after the court made the true finding on the murder petition, the parties appeared at a previously scheduled disposition hearing on the robbery/grand theft petition. T.W. requested to be sentenced on the grand theft immediately; however, over T.W.'s objection, the court granted the

People's motion to continue sentencing so both petitions could be addressed contemporaneously.

In February, at the subsequent disposition hearing, the court granted the People's motion to dismiss the most recently filed robbery/grand theft petition. (Welf. & Inst. Code, § 782.) The court then continued T.W. as a ward of the court under Welfare and Institutions Code section 602, placed him under the supervision of the probation officer, and committed him to DJJ. The court stated the maximum term of confinement to be 120 years to life.[10] The court also found T.W. in violation of his probation in connection with the August 20, 2018 petition.

DISCUSSION

I

*Gang Expert's Testimony Regarding Predicate Offenses*

A. *Additional Background Information*

The People filed a motion in limine asking the court to permit a gang expert to testify. The People argued it was appropriate for a gang expert "to relay general background information relating to the criminal street gang at issue, including: (1) his opinion as to how the gang operates, (2) the gang's primary activities[,] and (3) the gang's pattern of criminal activity (predicates) including the gang membership of the predicate offenders." The People indicated they planned to "introduce certified copies of the predicate

---

[10] It appears the court accepted the maximum term calculated by the DJJ, comprised of 25 years to life for the murder (§ 187, subd. (a)), 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and 10 years for the gang enhancement (§ 186.22, subd. (b)(1)) on count 1, plus an additional 25 years to life for the conspiracy to commit murder (§ 182, subd. (a)(1)), 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and 10 years for the gang enhancement (§ 186.22, subd. (b)(1)) on count 2.

14

offenses into evidence," and ask the expert "whether he has an opinion as to if the people identified in the predicate offense are in fact gang members." The People indicated the gang expert would testify about the history and background of the Emerald Hills Blood gang, as well as the number of members, the common signs and symbols of the gang, the primary activities of the gang, the gang's qualifying predicate offenses, and ultimately render an opinion that the murder in this case was done for the benefit of, at the direction of, or in association with the Emerald Hills Blood gang and with the specific intent to assist, further, or promote criminal conduct by gang members. Defense counsel indicated he intended to lodge "*Sanchez* objections and other objections . . . as they come up."[11] The trial court ruled that, given the allegations, a gang expert's testimony was relevant and admissible, and the court encouraged defense counsel to make his objections as necessary during the expert's testimony. Defense counsel did not object to the gang expert's testimony at trial.

As previously discussed, Detective Morgan testified as an expert regarding the Emerald Hills Blood gang, which she had been responsible for covering for approximately six months. To establish that the Emerald Hills Blood gang members had engaged in a pattern of criminal activity (§ 186.22, subd. (e)), she testified regarding six predicate offenses. With respect to each of the six offenses, she was shown a conviction record and testified that the three individuals who committed the six offenses were members of the Emerald Hills Blood gang. In each instance, she indicated her opinions were based on "read[ing] the reports for these cases" and speaking with "the detective who handled . . . Emerald Hills at the time."

---

11      *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

15

Ultimately, the juvenile court found the gang enhancement true with respect to both counts charged. (§§ 187, subd. (a), 182, subd. (a), 186.22, subd. (b)(1).) In addition, the court expressly found that both T.W. "and his cohorts" engaged in a criminal conspiracy to commit murder. (§ 182, subd. (a)(1).)

B. *Applicable Law*

The California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) created a substantive offense of active participation "in any criminal street gang" (§ 186.22, subd. (a)) and a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)(1)). (See *People v. Valencia* (2021) 11 Cal.5th 818, 829 (*Valencia*).)

The gang enhancement applies to "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) "There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1), both of which must be established by the evidence. [Citation.] The first prong requires proof that the underlying felony was 'gang related,' that is, the defendant committed the charged offense 'for the benefit of, at the direction of, or in association with any criminal street gang.' [Citations.] The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 948.)

To establish that a gang is a "criminal street gang," the prosecution must prove that the gang has as one of its "primary activities" the

16

commission of one or more of the crimes enumerated in section 186.22, subdivision (e), and that it has engaged in a " 'pattern of criminal gang activity' " by committing two or more such predicate offenses. (§ 186.22, subds. (e), (f).)[12] "[T]he requisite 'pattern' can . . . be established by evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member." (*People v. Loeun* (1997) 17 Cal.4th 1, 5 (*Loeun*); *People v. Miranda* (2016) 2 Cal.App.5th 829, 840.) "[T]he statute expressly does not require that the offense necessarily result in a *conviction*"; evidence of the *commission* of the offense is sufficient. (*People v. Garcia* (2014) 224 Cal.App.4th 519, 524 (*Garcia*), italics added.)

In *Sanchez*, our Supreme Court observed, "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement." (*Sanchez*, *supra*, 63 Cal.4th at pp. 682-683.) "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly

---

12      Subdivision (e) of section 186.22 lists 33 crimes which constitute predicate offenses, including the commission or attempted commission of murder, robbery, assault with a deadly weapon or by means likely to produce great bodily injury, and prohibited possession of a firearm.

worded hypothetical question in the traditional manner." (*Id*. at p. 684, fn. omitted.)  By contrast, the Court did "not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Id*. at p. 685.)  The Court explained that its decision did not "affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (*Ibid*.)

After *Sanchez*, a split of authority developed as to whether testimony about predicate offenses constitutes case-specific hearsay under *Sanchez*,[13] or whether it is admissible general background information that an expert can rely on and relate to the jury.[14]  Our Supreme Court resolved that dispute in *Valencia*, where it held that "the particular facts offered to prove predicate offenses as required by the STEP Act are not the sort of background hearsay information about which an expert may testify.  Competent evidence of those particulars is required." (*Valencia*, *supra*, 11 Cal.5th at p. 839, fn. omitted.)

Because the parties had briefed this issue before *Valencia* was decided, we requested that the parties provide supplemental briefs addressing the decision's impact on the issues presented on appeal, including whether any alleged error should be assessed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), and whether any alleged error was

---

[13]    See *People v. Thompkins* (2020) 50 Cal.App.5th 365, 411; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 582; *People v. Lara* (2017) 9 Cal.App.5th 296, 337.

[14]    See *People v. Bermudez* (2020) 45 Cal.App.5th 358, 377; *People v. Meraz* (2018) 30 Cal.App.5th 768, 781; *People v. Blessett* (2018) 22 Cal.App.5th 903, 943-945, review granted Aug. 8, 2018, S249250; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411.

harmless under the applicable standard. Both parties agree that the gang expert testimony that was used to prove the six predicate offenses was improperly based on inadmissible, case-specific hearsay and further agree that the error should be assessed under *Chapman*. The parties disagree, however, as to whether the error was prejudicial under that standard.

C. *Discussion*

Our Supreme Court has held that "facts concerning particular events and participants alleged to have been involved in predicate offenses . . . constitute case-specific facts that must be proved by independently admissible evidence." (*Valencia, supra*, 11 Cal.5th at p. 839.) When Detective Morgan opined that the three individuals who committed the six predicate offenses were members of the Emerald Hills Blood gang, she acknowledged that she lacked personal knowledge of the cases and their perpetrators, explaining that her opinion was based on a review of reports and conversations with another officer.[15] Police reports and statements of other officers memorialize facts relating to past criminal activity and are testimonial in nature. "When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* [*v. Washington* (2004) 541 U.S. 36], teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for

_____

[15] The certified court records do not provide evidence of the perpetrators' alleged gang affiliation. An order granting R.S. probation after his guilty plea to unlawfully possessing a firearm in 2011 (former § 12021, subd. (e), see now § 29800) prohibits him from associating with gang members or others associated with "Emerald Hills/Upside Sick or Any Known," but there was no gang enhancement charged or admitted in that case, and the conviction is outside the three-year requirement for predicate offenses set forth in subdivision (e) of section 186.22.

use at trial." (*Sanchez, supra*, 63 Cal.4th at p. 694.) "Without independent admissible evidence of the particulars of the predicate offenses, the expert's hearsay testimony cannot be used to supply them. In the absence of any additional foundation, the facts of an individual case are not the kind of general information on which experts can be said to agree." (*Valencia, supra*, 11 Cal.5th at p. 838.) We therefore agree with the parties that the gang expert's testimony here was improperly based on inadmissible, case-specific hearsay.

We further agree that the erroneous admission of case-specific facts concerning predicate offenses is generally reviewed for prejudice under the *Chapman* standard. (*Valencia, supra*, 11 Cal.5th at p. 840.) Under *Chapman*, the People have the burden of showing that the error was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at pp. 24-26, see *People v. Jackson* (2014) 58 Cal.4th 724, 748.) In this case, however, defense counsel failed to object at trial to the gang expert's testimony regarding the predicate offenses. T.W. therefore forfeited his claim of error. (See *People v. Arredondo* (2019) 8 Cal.5th 694, 710 [defendant "forfeited his claim under the confrontation clause by failing to object at trial"].) T.W.'s forfeiture of his constitutional claim impacts how we review the issue of prejudice. T.W. argues that, if his claims were forfeited by counsel's failure to object, he received ineffective assistance of counsel. We therefore apply the *Strickland* standard: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*); see *People v. Ledesma* (1987) 43 Cal.3d 171, 208-209, 217-218 [applying *Strickland*'s "reasonable probability" test to ineffective assistance claim based on defense counsel's failure to protect

20

defendant's Fourth Amendment rights by filing a suppression motion]; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008 ["had [defendant] not forfeited his direct claim of [constitutional] error, we would review whether any such error was harmless under the standard set forth in *Chapman*" rather than *Strickland*].)

Regardless of how we evaluate prejudice, using either the *Strickland* or *Chapman* standard, we conclude the error was harmless. There was other, properly admissible evidence of predicate offenses committed by members of the Emerald Hills gang to independently demonstrate the requisite pattern of criminal gang activity.

"Under the [gang enhancement] statute, the pattern of criminal gang activity can be established by proof of 'two or more' predicate offenses committed 'on separate occasions, *or* by two or more persons.' " (*Loeun, supra*, 17 Cal.4th at p. 9.) "[W]hen the prosecution chooses to establish the requisite 'pattern' by evidence of 'two or more' predicate offenses committed on a single occasion by 'two or more persons,' it can, as here, rely on [1] evidence of the defendant's commission of the charged offense and [2] the contemporaneous commission of a second predicate offense by a fellow gang member." (*Id*. at p. 10.) Each of these requirements is satisfied here.

First, there was proof of a predicate offense committed by T.W. T.W.'s conviction in the instant offense for murder and conspiracy to commit murder—both enumerated predicate offenses under section 186.22, subdivision (e)—is sufficient to satisfy one of the two predicate offenses needed to demonstrate a pattern of criminal gang activity. (*People v. Tran* (2011) 51 Cal.4th 1040, 1046 ["[A] predicate offense can be established by proof of an offense committed by the defendant."].)

Second, there was proof of the contemporaneous commission of the predicate offense of conspiracy to commit murder by T.W.'s fellow gang member, K.W. (*Loeun*, *supra*, 17 Cal.4th at p. 11 ["[T]he prosecution can establish the requisite 'pattern' exclusively through evidence of crimes committed contemporaneously with the charged incident."].) The evidence established that both T.W. and K.W. were involved in the conspiracy to commit murder of Ishi Hampton. There was substantial evidence establishing that T.W. was the shooter, and his fellow gang members (including K.W.) conspired to murder the victim in apparent response to his unexplained presence at a park in their gang territory, on a day of special significance to the gang. K.W. participated in the conspiracy by waiting six hours outside the victim's apartment before T.W. shot the victim and all three minors coordinated their escape. Based on this evidence, the juvenile court expressly found that T.W. "and his cohorts engaged in a criminal conspiracy . . . in furtherance of a criminal street gang"—which was sufficient to establish the second predicate offense required to support the gang enhancement. (See *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1003 ["a pattern can be established by two or more incidents, each with a single perpetrator, or by a single incident with multiple participants committing one or more of the specified offenses"].) Although there is no evidence in the record on this appeal of K.W.'s conviction of conspiracy to commit murder, a conviction is not required for the offense to qualify as a predicate crime. (*Garcia*, *supra*, 224 Cal.App.4th at p. 524.)

In addition, admissible evidence established T.W. and K.W. were members of the same criminal street gang—the Emerald Hills gang. They were both photographed showing their gang signs, depicting their gang colors, and denigrating a rival gang. Based on her own knowledge of the

22

gang and her review of T.W. and K.W.'s cell phone records and social media accounts, Detective Morgan opined that both T.W. and K.W. were members of the Emerald Hills gang.  Detective Morgan further opined that, if two Emerald Hills gang members and an associate drove to an apartment complex, waited outside for six hours, and then shot and killed the victim, the perpetrators would be committing this crime for the benefit of the Emerald Hills Blood gang with the intent to promote and assist further criminal activity by gang members.  Detective Morgan testified that "Emerald Hills is a smaller gang set than many of the other gangs in San Diego[,] [s]o they have to be hard and brutal to show that they're . . . worthy of this status.  And that is committing violent crimes such as murder, which is obviously the most heinous crime."  She explained that committing such a heinous crime bolstered the individual status of the gang members, proved their loyalty to the gang, improved the gang's status of fear and respect in the community, and prevented witnesses and victims from testifying out of fear of violence.

All of this evidence—the defendant's instant crimes, and the contemporaneous offense committed by K.W., his coconspirator and fellow Emerald Hills gang member—independently supports imposition of the gang

23

enhancement. (§ 186.22, subd. (e) [predicate offenses must be "committed on separate occasions, *or by two or more persons*"], italics added.)[16]

T.W. claims that, by relying on the instant offenses to establish a pattern of criminal gang activity, the Attorney General is improperly asserting a "new theory on appeal." T.W. likens the case to *People v. Hines* (1997) 15 Cal.4th 997, in which the Supreme Court observed that, because the prosecution had not asserted certain grounds to justify the admission of evidence excluded at trial, the Attorney General could not subsequently assert those grounds on appeal. (*Id.* at p. 1034, fn. 4.) But the Attorney General is not raising a new issue for the first time on appeal. The People asserted in their trial brief that "the currently charged offense may be used for the purpose of establishing the pattern of predicate offenses." Citing *Loeun*, *supra*, 17 Cal.4th at pages 9 through 11, the People further explained

_____

[16] We recognize that the combined activity of a defendant and an *aider and abettor* to the crime results in only a single predicate offense for purposes of section 186.22. (*People v. Zermeno* (1999) 21 Cal.4th 927, 931-932.) It is unnecessary for us to decide whether *Zermeno*'s holding extends to a conspiracy. " 'Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 258-259.) " 'Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.' [Citations.] Conspiracy separately punishes not the completed crime, or even its attempt. The crime of conspiracy punishes the agreement itself and 'does not require the commission of the substantive offense that is the object of the conspiracy.' " (*Id.* at p. 258.) Even assuming the holding in *Zermeno* applies to conspiracies, the conspiracy itself would still constitute a single predicate offense. There was also another qualifying predicate offense—T.W.'s possession of a firearm as a minor (§ 186.22, subd. (e)(23); see *Garcia, supra*, 224 Cal.App.4th at p. 524 [*commission* of offense satisfies predicate offense requirement])—in addition to the conspiracy to commit murder. Accordingly, regardless of whether *Zermeno* applies here, T.W.'s current conduct and another gang member's contemporaneous conduct established the pattern of criminal gang activity needed to support the gang enhancement.

24

that "[i]f the defendant and another gang member both committed qualifying crimes during the course of the charged event, that event *alone* may be sufficient to establish a pattern" of criminal gang activity. The People further asserted that one of the methods they could use to satisfy the predicate offense requirement was to prove "the charged offense by the defendant gang member plus another offense committed on the same occasion (the charged incident) by a fellow gang member." At trial, the prosecution presented evidence regarding the instant offense, including fellow Emerald Hills gang member K.W.'s involvement in the charged offense. During closing arguments, although the prosecutor referred to the "six separate predicates showing the pattern of criminal activity," the prosecutor also more broadly summarized the instant offenses involving both the defendant and his coconspirator K.W., stating "here we have the defendant in association with another Emerald Hills Blood member[, K.W.,] committing a lying-in-wait murder," and "that conduct in and of itself is solely designed to promote and further assist in criminal conduct by other gang members, specifically in this case [K.W.], who was present four to six hours prior to the murder and fleeing the scene afterwards."[17] We therefore reject T.W.'s contention that this is a "new theory on appeal." Moreover, this

---

[17]    We do not find the prosecutor's reference to the "six" predicate offenses during closing argument to be dispositive. Instead, we presume the trial court was aware of the law and its ability to use the charged offenses to establish the existence of the predicate offenses, particularly where the legal issues had been briefed in advance of trial and the defendant had an adequate opportunity to respond to both the legal issues and the facts presented to support this theory of liability. (See *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402 ["However the prosecutor chose to argue the matter, the jury knew that it could consider the current offenses as a predicate offense under the statute."].)

is not the sort of "new theory" that is prohibited on appeal. Rather, it is an argument of law applied to the facts deduced at trial. (See *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [a reviewing court has "discretion to consider a new theory on appeal when it is purely a matter of applying the law to undisputed facts."]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶ 8:237 ["A new theory pertaining *only* to *questions of law* on *undisputed fact*s can be raised for the first time on appeal. Reason: In these circumstances, there is no 'unfairness' to opposing parties, because they have not been deprived of the opportunity to litigate disputed fact issues."].)

In sum, despite the erroneous admission of case-specific testimonial hearsay regarding predicate offenses, independently admissible evidence supports the court's finding of a pattern of criminal gang activity. T.W.'s own conduct in this case establishes one of the requisite predicate offenses, and the second predicate offense is established by fellow gang member K.W.'s contemporaneous commission of conspiracy to commit murder. Given this independent evidence of two predicate offenses, it is not reasonably probable that T.W. would have achieved a more favorable result if his counsel had objected to evidence of *other* predicate offenses. (*Strickland, supra,* 466 U.S. at p. 687.) Even under the *Chapman* standard, which does not apply here given defense counsel's forfeiture of T.W.'s constitutional claim, the admission of testimonial hearsay about predicate offenses was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at pp. 24-26.)

II.

*Certified Records of Prior Convictions*

T.W. contends that using the certified court records to prove the dates on which six predicate acts were committed violated his constitutional rights.

26

(See *People v. Garcia* (2020) 46 Cal.App.5th 123, 169-170 [using conviction records to establish the date of the predicate offense violated the confrontation clause and *Kirby v. U.S.* (1899) 174 U.S. 47]; but see *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [conviction records are generally not testimonial in nature because they are "prepared to provide a chronicle of some act or event relating to the public employee's duty" and are not "produced to be used in a potential criminal trial or to determine whether criminal charges should issue"].) T.W. did not object to the admission of these documents at trial and thus forfeited this claim. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171; Evid. Code, § 353.) T.W. contends that counsel's failure to object constitutes deficient performance. (*Strickland*, *supra*, 466 U.S. at pp. 687-696 [constitutional claim of ineffective assistance of counsel requires proof of deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome].) Even if we were to assume (without deciding) that the trial court erred in admitting these documents, we would conclude that T.W. was not prejudiced. As outlined *ante*, other competent evidence presented at trial proved beyond a reasonable doubt Emerald Hill's pattern of criminal activity.

## III.

### *DJJ Placement*

T.W. contends the trial court improperly committed him to DJJ, arguing that the most recent offense he committed—grand theft—makes him ineligible for such commitment under Welfare and Institutions Code

section 733.[18] We conclude the trial court did not abuse its discretion in dismissing the robbery/grand theft petition pursuant to Welfare and Institutions Code section 782—leaving the most recent offense of murder, which does make him eligible for DJJ commitment. We therefore reject T.W.'s claim of error.

The relevant procedural history is outlined *ante*. For purposes of this section, we merely summarize the following key dates: (1) the murder and conspiracy to commit murder occurred on May 2, 2019 (and the petition relating to these offenses was filed on May 30, 2019); and (2) the alleged robberies occurred on May 17, 2019 (but the petition for this offense was not filed until December 11, 2019).

The dispute in this case centers around Welfare and Institutions Code section 733, which outlines the offenses that are eligible for DJJ commitment, and Welfare and Institutions Code section 782, which authorizes the juvenile court to dismiss a petition. Welfare and Institutions Code section 733, subdivision (c) provides, "A ward of the juvenile court who meets any condition described below shall not be committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities: [¶] . . . [¶] (c) The ward has been or is adjudged a ward of the court pursuant to Section 602, and the most recent offense alleged in any petition and admitted or found to be true by the court is not described in subdivision (b) of Section 707 or subdivision (c) of Section 290.008 of the Penal Code." "[T]he language of section 733[, subdivision] (c) is clear and lends itself to only one

---

[18] Robbery and murder are DJJ-qualifying offenses. (Welf. & Inst. Code, § 707, subd. (b)(1), (3).) Grand theft is not. (See *id*., § 707, subd. (b), Pen. Code, § 290.008.) Although the petition at issue alleged two counts of robbery, T.W. admitted to one count of grand theft. As noted *ante*, we refer to this petition as the robbery/grand theft petition.

reasonable interpretation. The statute premises [DJJ] eligibility on the nature of '*the most recent offense* alleged in *any petition* and admitted or found to be true by the court.' [Citation.] Plainly, this language refers to the last offense that was adjudicated to have been committed by the minor. A minor can be committed to [DJJ] only if this particular offense is listed in section 707[, subdivision] (b) or Penal Code section 290.008[, subdivision] (c)." (*In re D.B.* (2014) 58 Cal.4th 941, 947 (*D.B.*).)

Welfare and Institutions Code section 782 provides, "A judge of the juvenile court in which a petition was filed may dismiss the petition, or may set aside the findings and dismiss the petition, if the court finds that the interests of justice and the welfare of the person who is the subject of the petition require that dismissal, or if it finds that he or she is not in need of treatment or rehabilitation. The court has jurisdiction to order dismissal or setting aside of the findings and dismissal regardless of whether the person who is the subject of the petition is, at the time of the order, a ward or dependent child of the court. Nothing in this section shall be interpreted to require the court to maintain jurisdiction over a person who is the subject of a petition between the time the court's jurisdiction over that person terminates and the point at which his or her petition is dismissed."

We review the juvenile court's dismissal of a petition under Welfare and Institutions Code section 782 for abuse of discretion. (See *In re Greg F.* (2012) 55 Cal.4th 393, 420 (*Greg F.*) [dismissal "is appropriate under section 782 so long as the juvenile court, in its discretion, finds that the dismissal is required by the interests of justice and the welfare of the minor"].)

In February 2020, the juvenile court exercised its discretion under Welfare and Institutions Code section 782 and dismissed the most recently

filed robbery/grand theft petition in "the interest of justice." In doing so, the court made the following findings:

> "[T]he record will reflect[] that I have weighed and considered the interest of the minor, T.W.; and the interest of society. And I find, first of all, that the court has discretion to dismiss [the robbery/grand theft petition] to make the minor eligible for a DJJ commitment.

> "The court also finds the interest of justice and the welfare of the minor require dismissal of the [robbery/grand theft petition] in a DJJ commit.

> "Third[, t]he minor is in need of further treatment and rehabilitation that is highly structured and intensive. And the welfare of the minor requires dismissal of [the robbery/grand theft petition].

> "And, in particular, the court finds the minor is in need of lengthy rehabilitative services that address family dysfunction, deep gang involvement, trauma and behavioral treatment and therapy[, p]ositive youth skills[, e]ducation and work skills.

> "And lastly, the minor committed the most serious of offenses, and a DJJ commitment will increase the amount of time the court has jurisdiction over the minor and the amount of time that the court has to work with the youth.

> "So the court finds that a dismissal of the [robbery/grand theft petition] will serve the interest of justice and the welfare of the youth by increasing the court's dispositional options."

The court continued T.W. as a ward of the court, placed him under the supervision of the probation officer, and committed him to DJJ.

Based on this record, we reject T.W.'s claim that the juvenile court improperly committed him to DJJ. Our Supreme Court has recognized that Welfare and Institutions Code sections 733 and 782 are not "irreconcilably in conflict." (*Greg F.*, *supra*, 55 Cal.4th at p. 407.) "Section 733[, subdivision] (c)

prohibits a commitment to [DJJ] unless the minor's most recent offense alleged in a petition is of a particular class. If the juvenile court exercises its discretion under section 782 to dismiss a 602 petition, its decision does not nullify or abrogate section 733[, subdivision] (c)." (*Id.* at p. 408.)

Here, the court indicated it was dismissing the robbery/grand theft petition in the interest of justice and for T.W.'s welfare. (See *Greg F.*, *supra*, 55 Cal.4th at p. 408.) The court indicated it had "weighed and considered the interest of [T.W.] and the interest of society." The court found that T.W. needed "highly structured and intensive" further treatment and rehabilitation that would address issues such as "family dysfunction, deep gang involvement, trauma and behavioral treatment and therapy[, p]ositive youth skills[, e]ducation and work skills," and dismissal of the petition was necessary to obtain such treatment. The court reasoned that, since T.W. had committed "the most serious of offenses," a commitment would "increase the amount of time the court has jurisdiction over [T.W.] and the amount of time that the court has to work with [T.W.]." Because the court weighed the appropriate factors and indicated it was dismissing the robbery/grand theft petition in the interest of justice and for T.W.'s welfare, the court's decision to dismiss the petition was not an abuse of its discretion. (*Ibid.*) Because the court properly exercised its discretion to dismiss the disqualifying petition, Welfare and Institutions Code section 733, subdivision (c) did not preclude DJJ commitment, and the juvenile court's decision to place T.W. in DJJ was proper. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396 [appellate court reviews the juvenile court's decision to commit a minor to DJJ for abuse of discretion]; Welf. & Inst. Code, §§ 733, 707, subd. (b).)

T.W.'s reliance on *D.B.* is misplaced. In that case, the juvenile court committed the minor to DJJ where the minor was found to have committed a

31

series of offenses ending in a nonqualifying offense. (*D.B.*, *supra*, 58 Cal.4th at p. 947.) The commitment was improper because "the most recent offense" rendered the minor ineligible for DJJ commitment. (Welf. & Inst. Code, § 733, subd. (c).) Here, the petition alleging the more recent, nonqualifying offense was properly dismissed under Welfare and Institutions Code section 782, rendering T.W. eligible for DJJ commitment under Welfare and Institutions Code sections 733 and 707, subdivision (b).

T.W.'s reliance on *In re A.O.* (2017) 18 Cal.App.5th 390 is similarly misplaced. In that case, the juvenile court struck a non-eligible petition without making findings to show it had properly exercised its discretion to make a valid dismissal under Welfare and Institutions Code section 782, stating only that its dismissal order was for the purpose of making the minor eligible for DJJ commitment. (*A.O.*, at p. 396.) The minor had admitted the allegations of the petition which was not part of the record on appeal, and it was not clear whether the admissions were made pursuant to a plea agreement. (*Ibid.*) In addition, the record was devoid of the facts underlying the offense that purportedly qualified the minor for DJJ commitment. (*Ibid.*) On the "sparse record" before it, the appellate court concluded it would be "impossible to determine" if the juvenile court's dismissal of the disqualifying offense was a proper exercise of discretion. (*Id.* at pp. 396-397.) In contrast, here, the juvenile court clearly stated its findings supporting dismissal of the disqualifying grand theft petition, and we have a clear record indicating T.W.'s admissions to the grand theft were not induced by any promises of sentencing leniency. Based on the record, T.W.'s offenses of murder and conspiracy to commit murder qualify him for DJJ commitment.

## IV.

### *Section 654*

Relying on section 654, subdivision (a), T.W. contends that the juvenile court erred by imposing punishment as to counts 1 and 2 because T.W. did not harbor independent criminal objectives as to the murder and the conspiracy to commit the same murder.  The Attorney General concedes that, based on the evidence presented at trial, section 654 requires staying punishment for conspiracy to commit murder.  We agree.

Section 654, subdivision (a), provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Under section 654, "a defendant cannot be punished for both a substantive offense and a conspiracy to commit it unless the conspiracy had an unlawful objective in addition to the commission of the substantive offense."  (*In re Romano* (1966) 64 Cal.2d 826, 828.)

In the present case, there was no evidence that the conspiracy had any objective apart from the murder of Ishi Hampton.  After Hampton was seen at the Emerald Hills park on the gang's day of celebration, T.W. and the other two minors drove to Hampton's apartment and waited for about six hours for Hampton to exit his home.  T.W. immediately approached Hampton and shot at him multiple times, then all three suspects promptly fled the scene together.  Because the sole object of the conspiracy was Hampton's murder, T.W. cannot be punished for both the substantive offense of murder and the conspiracy to commit it.  (*People v. Hernandez* (2003) 30 Cal.4th 835, 866 ["Under . . .  section 654, a defendant may not be punished for both the murder and the conspiracy."], disapproved on other grounds in *People v.*

*Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) We therefore direct that the judgment be modified to stay the terms imposed as to count 2 for conspiracy to commit murder and the associated enhancements.

V.

*The 10-year Gang Enhancements*

T.W. contends that the 10-year enhancements imposed under section 186.22, subdivision (b)(1)(C) were unauthorized and should be stricken. The Attorney General agrees and argues the terms should be replaced with a 15-year minimum parole eligibility period under section 186.22, subdivision (b)(5). We agree.

Section 186.22, subdivision (b)(1)(C) provides for an additional term of 10 years when a defendant is convicted of a violent felony that was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist criminal conduct by gang members. "Section 186.22[, subdivision] (b)(1)(C) does not apply, however, where the violent felony is 'punishable by imprisonment in the state prison for life.' [Citation.] Instead, section 186.22, subdivision (b)(5) (section 186.22(b)(5)) applies and imposes a minimum term of 15 years before the defendant may be considered for parole." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) Because a gang-related murder is a violent felony punishable by imprisonment for life, this offense is not subject to the 10-year enhancement under section 186.22, subdivision (b)(1)(C). (*Lopez*, at pp. 1004, 1011.) "Instead, section 186.22, subdivision (b)(5) . . . applies and imposes a minimum term of 15 years before the defendant may be considered for parole." (*Id*. at p. 1004.)[19]

---

[19] The same principle applies to conspiracy to commit murder which is also punishable by imprisonment for life. (§ 182, subd. (a)(1).)

We therefore modify the judgment and order that the 10-year enhancements imposed pursuant to section 186.22, subdivision (b)(1)(C) be stricken.  (See *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1405 [modifying judgment to strike 10-year gang enhancements "and impose, in their place, 15-year minimum parole eligibility terms"].)

## DISPOSITION

The judgment is modified to strike the 10-year enhancements imposed on counts 1 and 2 under Penal Code section 186.22, subdivision (b)(1)(C), and to instead provide that section 186.22, subdivision (b)(5) imposes a minimum term of 15 years before T.W. may be considered for parole.  The judgment is further modified to stay the sentence on count 2 under section 654.  As modified, the judgment is affirmed.

GUERRERO, J.

WE CONCUR:

McCONNELL, P. J.

DO, J.